William H. BLOCH and wife, Audrey H.
Bloch, Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Civ. A. No. 64–C–59.

United States District Court
S. D. Texas,
Corpus Christi Division.

Dec. 14, 1966.

William H. Bloch and Robert B. Alexander, Jr., Corpus Christi, Tex., for plaintiffs.

Richard M. Roberts, Acting Asst. Atty. Gen., Woodrow Seals, U. S. Dist. Atty., Myron C. Baum and Robert L. Waters, Attys., Dept. of Justice, for defendant.

## MEMORANDUM

GRAVEN, Senior District Judge.

1. In this action the plaintiffs seek to recover under the provisions of Section 7472, Title 26 U.S.C.A., certain income taxes and deficiency interest which they allege were erroneously assessed against and collected from them. For convenience the parties refer to the plaintiff, William H. Bloch, as the taxpayer, and he will be so referred to herein. In the complaint, recovery was sought of certain taxes assessed against and collected from the taxpayer growing out of stock redemption distributions made to the taxpayer by Southern Elevator and Storage Company, Inc., a Texas corporation, hereinafter sometimes referred to as Southern. Recovery was also sought for certain taxes assessed against and collected from the taxpayer growing out of an installment sale of certain law office equipment. The Government has conceded that the latter claim is well founded. However, the Government contests the claims of the plaintiffs relating to the stock redemption distributions from Southern referred to above.

The Internal Revenue Service made deficency income tax assessments against the taxpayer for the years 1960 and 1961 based upon the distributions made to him by Southern during those years.

The taxpayer paid those assessments, plus interest. He made timely claims for refund of those payments, which were subsequently disallowed. This action followed. The hub of the controversy is whether the stock redemption distributions received by the taxpayer from Southern should be taxable to him as ordinary income or as capital gains.

2. In 1954 Southern Elevator and Storage Company, Inc. was incorporated under the laws of the State of Texas by the Guaranty Trust Company as Trustee of the Sally Gerdes Inter Vivos Trust, Casper Gerdes individually, and Dr. George O'Byrne, to construct and operate a grain storage facility at Edroy, Texas. At or about the same time, the same persons formed another corporation with the name of Louisiana Elevator and Storage Company to construct and operate a grain elevator at Taft, Texas. The incorporators conveyed to Southern cash and certain real properties located at Edroy, Texas. Grain storage facilities were constructed by Southern at Edroy, Texas, and by the Louisiana Elevator and Storage Company at Taft, Texas. William H. Bloch was and is an attorney engaged in the practice of law at Corpus Christi, Texas. While his practice was somewhat general in character, he did a substantial amount of tax work; and in connection therewith acted as tax counsel for numerous clients. Bloch was not originally a stockholder in either of these two corporations. However, when they encountered a number of difficulties and problems Bloch was called on to be of assistance in connection therewith. By much effort he was able to get the affairs of the Louisiana Elevator and Storage Company in such shape that its business could be sold. He also put in much effort to work out a solution to the problems with which Southern was confronted. These problems centered around grain stored by Southern going out of condition. This in turn precipitated a financial crisis. Southern had obtained a loan in the amount of $140,000 from the Corpus Christi State National Bank, the pay-

ment of which had been guaranteed by Casper Gerdes and Dr. George O'Byrne. As collateral, those two had pledged all 680 shares of capital stock of Southern. In the fall of 1955 the unpaid balance of that loan was $95,000. After the Government ordered Southern to ship out its deteriorated grain the bank refused to extend the loan and insisted upon payment. Southern was also being pressed on numerous other claims. Bloch had been the attorney for one James H. Ewing who was a man of considerable wealth. Ewing had died some time prior to 1954. He had a daughter, Catherine, who was married to one B. F. Bryan. She was the beneficiary of a large trust created by Ewing. B. F. Bryan was desirous of getting into a business. Catherine Bryan was willing to assist him in doing so, provided that Bloch would be active in the operation of the business and that B. F. Bryan would be an officer of such business. Catherine Bryan agreed to put up a substantial amount of money so that the affairs of Southern might be straightened out and her husband become one of its managing officers. This agreement was carried out, as discussed in more detail below. Bloch proceeded to deal with the numerous claimants asserting claims against Southern, and by prodigious efforts was able to dispose of those claims.

3. Lee Orr Harris was an accountant practicing his profession at Corpus Christi. He had been the accountant for Southern and had kept its books and records. He was very highly regarded by Bloch, who desired that Harris be associated in the management of Southern. It was agreed among Bloch, Bryan and Harris that they would acquire the capital stock of Southern, which at that time was pledged to the Corpus Christi State National Bank. In the fall of 1955 Bryan secured an option to purchase that stock (subject to the pledge) for the sum of $18,000. Contemporaneously with the securing of that option, Bryan assigned 45 percent of it to Bloch and 10 percent of it to Harris. Bloch had insisted that Harris be brought into the management group.

After this transaction, the management group caused the remainder of the rotted grain then in Southern's storage facilities to be taken out and the facilities cleaned and fumigated. Those storage facilities were then empty until the 1956 harvest, which occurred in the midsummer of that year.

4. Bloch, Bryan and Harris were all agreed that the future of Southern was dependent upon securing competent management. In the spring of 1956 they set about securing such management. William R. Parrish was then in the employ of an elevator at Mathis, Texas. Bloch, Bryan and Harris, upon investigation, concluded that Parrish would provide competent management for Southern. They then entered into negotiations with him. Parrish, during the negotiations, made known the conditions under which he would assume management of Southern. He wanted a certain salary, a participation in the profits in the form of a bonus arrangement, and an assurance that he would ultimately become a part owner of the business, all of which was agreed to by Bloch, Bryan and Harris. A formal contract of employment was entered into by Southern and the respective individuals in April, 1956. This contract established the basis of Parrish's employment as plant manager. It also established the combination of Bryan as president, Bloch as secretary and Harris as treasurer of Southern, and provided for their compensation. Thereafter on June 1, 1956, at a meeting of the Board of Directors of Southern, a resolution was adopted whereby Southern obtained the agreement of Bloch and Bryan individually that they would each sell to the corporation 15 percent of the corporation's stock (102 shares each) owned by them, at such time as the stock was released from pledge to the Corpus Christi State National Bank. By a resolution adopted at the same meeting, Southern offered two-thirds of the stock to be redeemed to Parrish (136 shares

or 20% of the total corporate stock) and one-third to be redeemed to Harris (68 shares or 10% of the total corporate stock). The price to be paid by Parrish and Harris was 85 percent of the redemption cost of the stock to Southern. This redemption cost was to be determined as follows:

"The price to be paid by the Corporation for said stock shall be based on a valuation of land and improvements at $200,000, thus requiring the payment of $60,000 for the thirty per cent (30%) equity in land and improvements represented by thirty per cent (30%) of the stock to be redeemed. In addition, there shall be paid to the said B. F. Bryan and William H. Bloch thirty per cent (30%) of the total net asset value per books of all assets other than land and improvements owned by the Corporation at time of redemption."

5. Parrish proved to be a very competent manager and Southern carried on a successful and profitable grain storage business during the entire time its stock was owned by Bryan, Bloch, Harris and Parrish. In July, 1959, the indebtedness of Southern to the Corpus Christi State National Bank was in the amount of $50,000. Southern executed its note to that bank in that amount co-signed by Bryan, Bloch and Harris individually. On July 29, 1959, following that transaction, the bank returned the 680 pledged shares. Under the option to Bryan heretofore referred to, $18,000 was paid to Casper Gerdes, the Gerdes Trust and the O'Byrne Estate. Bryan, Bloch and Harris each paid his proportionate share of the $18,000. Following this transaction, the 680 shares were surrendered to Southern and it reissued certificates to Bryan for 306 shares, to Bloch for 306 shares, and to Harris for 68 shares. This was in accord with their previous agreement.

Prior to the harvesting of the 1958 grain it appeared that Southern would probably need additional storage facilities since the Commodity Credit Corporation had not shipped out the grain stored for a previous year. Attempts were made to have the Commodity Credit Corporation ship out the grain stored from the 1957 harvest, but those attempts were only partially successful. Southern thereupon obtained two 80,000-barrel oil storage tanks situated at the Humble Refinery at Texas City, Texas; had them taken down and shipped by barge to the Port of Corpus Christi, thence by truck to Edroy; and had them installed, together with aeration equipment, as a grain storage facility. This was a novel means of storing grain and it slightly more than doubled the total capacity of Southern.

6. At a meeting of the Board of Directors of Southern on January 2, 1959, a resolution was adopted authorizing an immediate stock redemption from Bryan and Bloch of 15 percent each of their Southern stock. This was in accordance with the resolution and agreement of June 1, 1956, referred to above. Pursuant to the January 2, 1959, resolution, on January 15, 1959, Bloch and Bryan each surrendered to Southern 102 shares of stock. In connection therewith, each of them received a non-negotiable, non-interest bearing note from the corporation in the amount of $35,700, dated January 2, 1959, and payable on or before three years from that date. That sum represented a redemption price of $350 per share, which was determined in accordance with the corporation's resolution of June 1, 1956, heretofore set out.

Southern paid the following amounts to Bloch on the dates indicated in satisfaction of the $35,700 note: $2,700 on April 28, 1960; $1,487.50 on February 3, 1961; $9,371.25 on February 24, 1961; and the remaining $22,141.25 on September 30, 1961. The note held by Bryan was fully paid not later than October 23, 1961.

In his 1960 and 1961 income tax returns Bloch reported the payments above set forth as capital gains. The Internal Revenue Service assessed the deficiency taxes based upon the contention that those payments constituted dividends, taxable as ordinary income. It is the

character of those payments to Bloch that is in controversy herein.

7. On January 15, 1959, Bloch and Bryan each surrendered to Southern his certificate for 306 shares of stock and each received a new certificate for 204 shares. The remaining 204 shares were cancelled in redemption by the secretary of the corporation and affixed to the corporate stock records as redeemed shares. Those 204 shares were then held in the corporate treasury for sale pursuant to the option contract to Parrish and Harris until paid for by the optionees. The resolution of January 2, 1959, heretofore noted, had granted Parrish and Harris an option for five years to purchase the redeemed stock at a price of $297.50 per share. Parrish and Harris exercised their options and redeemed shares were issued to them as paid for by them at various intervals subsequent to the redemption of the shares by the corporation. Reissue of the redeemed shares was made as follows:

| Price Paid to Corporation | Optionee | Date of Payment | Number of Treasury Shares Purchased |
|---|---|---|---|
| $ 1,487.50 | Parrish | 2/ 4/61 | 5 |
| 1,487.50 | Harris | 2/ 4/61 | 5 |
| 18,742.50 | Harris | 2/24/61 | 63 |
| 38,972.50 | Parrish | 10/23/61 | 131 |
| $60,690.00 | | | 204 |

On January 28, 1961, Southern declared a dividend of $2 a share payable to stockholders of record as of March 31, 1961. The resolution authorizing the dividend stated as follows:

"BE IT FURTHER RESOLVED THAT: A dividend be paid to stockholders of record as of the close of business on March 31, 1961, of $2 per share on all shares of the capital corporate stock constituting fully paid shares in the hands of the holders thereof and comprising duly authorized issued and outstanding shares as of said date and said dividend to be paid on shares certified as such by the Secretary, said certification to be on or before April 5, 1961, and dividend to be paid on April 10, 1961."

On March 31, 1961, Southern paid B. F. Bryan $408, a $2 per share dividend on 204 shares; paid William H. Bloch $408, a $2 per share dividend on 204 shares; paid Lee Orr Harris a dividend of $272, a dividend of $2 per share on 136 shares; and paid William R. Parrish a dividend of $10, being $2 per share on 5 shares. On June 30, 1961, Southern paid a dividend of 50 cents per share on fully paid shares, Bryan receiving $102 on 204 shares; Bloch receiving $102 on 204 shares; Harris receiving $68 on 136 shares; and Parrish receiving $2.50 on 5 shares. No further cash dividends were paid by the corporation. As heretofore noted, Southern carried on a very successful and profitable grain storage business. However, starting fairly early the other members of the management group became dissatisfied with the actions of B. F. Bryan in connection with Southern's affairs and dissension arose. Such dissension became increasingly bitter, finally resulting in a plan of liquidation being worked out. The liquidation of Southern was accomplished on August 24, 1961.

On May 15, 1956, Bryan, Bloch, Harris and Parrish entered into a partnership to engage in the business of buying, selling, and factoring grain and other products. That partnership will be referred to in more detail later on.

8. It was heretofore noted that the hub of this controversy is whether the

stock redemption distributions made by Southern to the taxpayer in 1960 and 1961 should be taxed as ordinary income or as capital gains. In that connection, it is necessary to consider certain statutory provisions and regulations. Section 316(a), Title 26 U.S.C.A., sets out the general rule or proposition that distributions by a corporation to its shareholders out of either current earnings and profits or earnings and profits accumulated since February 28, 1913, are dividends. Section 301(c) (1), Title 26 U.S.C.A., provides the further general rule that dividend distributions are taxable to the recipient as ordinary income unless they come within certain exceptions. Some of these exceptions are found in Section 302, Title 26 U.S.C.A., pertaining to distributions in redemption of stock. Section 302(a) provides that if the transaction constitutes a stock redemption within the definition of Section 302(b), it will be treated as in part or full payment in exchange for the stock and will qualify for capital gains treatment. Section 302(b) sets out four categories of stock redemption transactions, each of which will qualify for capital gains treatment. Since the parties agree that two of these four categories are not material under the facts of this case, only the two which the taxpayer contends do apply will be examined. Thus the pertinent points of Section 302 for purposes of this case are as follows:

"§ 302. Distributions in redemption of stock

"(a) General rule.—If a corporation redeems its stock * * * and if paragraph (1) * * * applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock.

"(b) Redemptions treated as exchanges.—

"(1) Redemptions not equivalent to dividends.—Subsection (a) shall apply if the redemption is not essentially equivalent to a dividend.

"(2) Substantially disproportionate redemption of stock.—

"(A) In general.—Subsection (a) shall apply if the distribution is substantially disproportionate with respect to the shareholder.

"(B) Limitation.—This paragraph shall not apply unless immediately after the redemption the shareholder owns less than 50 percent of the total combined voting power of all classes of stock entitled to vote.

"(C) Definitions.—For purposes of this paragraph, the distribution is substantially disproportionate if—

(i) the ratio which the voting stock of the corporation owned by the shareholder immediately after the redemption bears to all of the voting stock of the corporation at such time,

is less than 80 percent of—

(ii) the ratio which the voting stock of the corporation owned by the shareholder immediately before the redemption bears to all of the voting stock of the corporation at such time.

For purposes of this paragraph, no distribution shall be treated as substantially disproportionate unless the shareholder's ownership of the common stock of the corporation * * * after and before redemption also meets the 80 percent requirement of the preceding sentence. * * * *"

In the application of the provisions of Section 302 to the facts of this case, Section 318(a), Title 26 U.S.C.A., must also be considered since Section 302(c) (1) provides that in determining the ownership of stock for purpose of application of the provisions of Section 302 (b) to the facts of a particular case, the attribution rules of Section 318(a) are pertinent. Section 318, sometimes referred to as the constructive ownership or attribution statute, provides, in part, as follows:

"§ 318. Constructive ownership of stock

"(a) General Rule.—For purposes of those provisions of this subchapter

to which the rules contained in this section are expressly made applicable—

\* \* \* \* \* \*

"(2) Partnerships, estates, trusts, and corporations.—

"(A) Partnerships and estates.— Stock owned, directly or indirectly, by or for a partnership \* \* \* shall be considered as being owned proportionately by its partners or beneficiaries. Stock owned, directly or indirectly, by or for a partner or a beneficiary of an estate shall be considered as being owned by the partnership or estate."

It will be noted that the portions of Section 302(b) set out above characterize two types of transactions, either of which will qualify as a capital gains redemption. The first type of transaction is set forth in Subsection (b) (1), i. e., where the redemption is not essentially equivalent to a dividend. The other type of transaction is set forth in Subsection (b) (2), i. e., where the distribution is substantially disproporationate within the meaning of the Section. The parties are in controversy as to whether the redemption in this case falls into either of those categories. The issue as to the matter of the redemption in question being substantially disproportionate will first be considered.

Under the provisions of Section 302 relating to disproportionate distributions, a taxpayer is required to meet two tests, both of which are arithmetical in character. Those tests are as follows:

(1) Immediately after the redemption, the taxpayer must own less than 50 percent of the total combined voting power of all classes of stock entitled to vote, and

(2) Immediately after the redemption, the portion of the corporation's voting stock then owned by the taxpayer must be less than 80 percent of the portion of the stock owned by him before the redemption.

To state these tests another way, after the redemption a taxpayer must own less than 50 percent of the voting stock of the corporation, and the redemption must have reduced the ratio of his voting stock to the total corporate voting stock to an amount less than 80 percent of such ratio before the redemption.

It was heretofore noted that there were originally 680 shares of Southern voting stock, of which the taxpayer owned 306 shares. It was also heretofore noted that on January 15, 1959, the taxpayer and Bryan each surrendered his certificate for 306 shares and each was reissued a certificate for 204 shares. The 102 shares surrendered by each were surrendered for the purpose of carrying out the option agreements with Parrish and Harris. If these 204 shares were to be considered as not constituting voting stock of the corporation, then the voting stock consisted of 486 shares. It is clear that whether the voting stock is considered as being 680 shares or 486 shares, the taxpayer meets what will be referred to for convenience as the 50 percent test. The parties are not in controversy as to the taxpayer meeting that test. They are in controversy as to whether the taxpayer meets what will be referred to for convenience as the 80 percent test. That controversy revolves, in part, around whether the 204 shares surrendered by the taxpayer and Bryan and held in the treasury for the purpose of meeting the stock purchase options of Parrish and Harris shall be considered as voting stock for the purpose of applying the 80 percent test. The Government contends that those shares are not to be so considered. The taxpayer contends that they are to be so considered. The provisions of Section 302(b) (2) noted above make reference to the "voting stock" or "voting power" of the corporation. Treasury Regulations Section 1.302–3(a) relating thereto provides that the stock to be considered is that "which is issued and outstanding in the hands of the shareholders." Southern was a Texas corporation. A reference to Texas law is made by the taxpayer in his main brief in which he states: "Texas law would not permit the issuance of the

shares to Parrish and Harris in exchange for Notes. Therefore the shares were held in the Corporate treasury until paid for in compliance with the law * * *." It appears that the stock in question was held in the corporate treasury until paid for. The pretrial stipulation of facts reflects that Parrish and Harris participated in corporate dividends only as to the issued shares. The taxpayer relies strongly on the case of Sorem v. Commissioner of Internal Revenue (10th Cir. 1964), 334 F.2d 275, in which a similar question was involved. The Court in that case held that for purposes of applying the constructive ownership or attribution rules of Section 318, employees who held stock options must be considered as owning the stock for which they held options. Under the holding of that case, the shares held in the corporate treasury by Southern for the purpose of meeting the options held by Parrish and Harris would be considered as owned by them in connection with the matter of the taxpayer meeting the 80 percent test. The provisions of Regulations Section 1.318–3(c), when coupled with those of Regulations Section 1.302–3(a), noted above, might be interpreted as requiring a different conclusion. Because of another feature, it is not necessary for the Court to decide whether the holding of the *Sorem* case should or should not be followed. However, if in this case this Court was squarely presented with the question as to whether the holding of the *Sorem* case should or should not be followed, it would be reluctant to follow such holding. It would seem that it would be highly questionable that stock held in the treasury of a corporation which might be issued or might never be issued depending upon whether the optionees of such stock would or would not exercise their options could not properly be considered as being owned by the optionees for the purpose of applying the attribution rules under Section 318.

However, assuming, as contended by the taxpayer, that Parrish and Harris are to be regarded as the owners of the 204 shares of stock in question, there comes into focus Section 318, heretofore set out and referred to by the parties as the constructive ownership or attribution statute. A portion of that statute pertinent to the facts in this case has since been repealed, but was in effect during the period of time here involved. It was heretofore noted that in 1956 Bloch, Bryan, Parrish and Harris had entered into a partnership. Because of some confusion and conflict in the briefs as to that partnership, it seems appropriate to set out a portion of the pretrial stipulation of facts relating to such partnership, as follows:

"14. On May 15, 1956, B. F. Bryan, William H. Bloch, Lee Orr Harris, and William R. Parrish entered into a partnership to engage in the business of brokering, factoring, and buying and selling grain and other products, the profits to be divided equally by said partners as to the first $10,000.00 of net partnership profits and with profits in excess of $10,000.00 to be distributed as follows: 40 percent to B. F. Bryan and 20 percent each to William H. Bloch, Lee Orr Harris and William R. Parrish. Losses were to be divided equally. The partnership made a profit in each and every year of its operation. The partnership actively began conduct of business in late June 1956."

The partnership was known as the Southern Elevator Grain Company. It continued to carry on its business operations through July, 1961, when it was dissolved, apparently because of dissension between B. F. Bryan and the other partners. The interest of the parties did not change during the existence of the partnership.

Under the provisions of the attribution statute (Section 318) then in effect, stock owned by a partner is deemed to be owned by the partnership, and stock owned by the partnership (including that which it is deemed to own because a partner actually owns it) is deemed to be owned by the partners in their partnership proportions. If, as the taxpayer

contends, Parrish and Harris were the owners of the 204 shares of option stock, under the provisions of Section 302(b)(2) it is manifest that they were also to be considered the owners of it under Section 318(a)(2), which is specifically made applicable to Section 302.

If the 680 shares are to be considered as the shares of stock outstanding both before and after redemption, it is then necessary to determine the ownership percentage in the light of the attribution statute. Before the redemption, the taxpayer owned 306 shares in his own right and constructively owned 93.5 shares through the partnership. The total percentage owned (399.5/680) was 58.75 percent. After the redemption, he owned 204 shares in his own right and constructively owned 119 shares through the partnership. The total percentage owned (323/680) was 47.5 percent. The after-redemption ownership was 80.8+ percent of the before-redemption ownership (47.5 to 58.75). Thus the taxpayer does not meet the 80 percent test.

The above conclusions result from application of the constructive ownership rules to the partnership situation, as follows. The ownership of the partnership shares before the redemption was as follows: Bryan's 306 shares and Harris' 68 shares, totalling 374 shares, are deemed to be owned by the partnership and are, in turn, deemed owned to the extent of one-fourth, or 93.5 shares, by the taxpayer as a partner to that extent. The ownership of the partnership shares after the redemption was as follows: Bryan's 204 shares, Parrish's 136 shares and Harris' 136 shares, totalling 476 shares, are deemed to be owned by the partnership and are, in turn, deemed owned to the extent of one-fourth, or 119 shares, by the taxpayer as a partner. The partnership was apparently somewhat related to Southern because of its personnel and business activities. However, in order for Section 318 to be applicable it is not necessary that the partnership be engaged in activities similar to that of the corporation involved.

If the 204 shares of stock held in the treasury are not regarded as voting stock, then the situation would be as follows: prior to the redemption the taxpayer owned 306 shares of the 680 shares outstanding, or 45 percent, and after the redemption he will have owned 204 shares of the 476 shares outstanding, or 42.8 percent. The 42.8 percent ownership percentage after redemption is substantially more than 80 percent of the 45 percent ownership percentage before redemption (being 95+ percent), so the taxpayer would also fail to meet the 80 percent test under this assumption of facts.

By way of summary, it can be stated that if the 204 shares held in the treasury of Southern are to be regarded as not outstanding stock, then the taxpayer would not meet the 80 percent test irrespective of constructive ownership or attribution rules. If those 204 shares are to be regarded as outstanding, then the taxpayer fails to meet the 80 percent test because of the applicability of the attribution statute (Section 318).

In his Reply Brief herein the taxpayer agreed that if the attribution rules are applicable the redemption would not be disproportionate as required by Section 302(b)(2). The taxpayer then goes on to state that it is his position that the pertinent provisions of Section 318 are unconstitutional. The Court, after a consideration of that constitutional attack, is of the view and holds that it is not well founded.

9. The next matter for consideration is whether the stock redemption distributions to the taxpayer were within the scope of Section 302(b)(1). As heretofore set out, that Section provides that a redemption is entitled to capital gains treatment "if the redemption is not essentially equivalent to a dividend." Several related issues are involved in a consideration of this question. These have to do with the adequacy of the corporate earnings and profits, whether the claims for refund properly raised such issue, and the proper time at which to

measure corporate earnings and profits for purposes of applying the provisions of Section 302(b) (1) to the facts of this case. The taxpayer contends that at the pertinent time in question the corporate earnings and profits were not adequate to cover the redemption distributions. In connection with this contention the Government asserts that the taxpayer did not properly raise such issue in his claims for refund. The taxpayer filed claims for refund based on deficiencies assessed against him for the calendar years 1960 and 1961. In his claim relating to the calendar year 1960, he stated that he was entitled to the allowance of his claim for the following reason:

"Out of a deficiency assessed for calendar year 1960 in the amount of $1,679.80 including penalty and interest, $1,161.00 tax assessed of $1,409.50 total tax assessed was attributable to inclusion in income of $2,700.00 alleged to constitute a distribution essentially equivalent to dividend which was in fact $2,700.00 proceeds for redeemed corporate stock of Southern Elevator & Storage Co., Inc. producing capital gain. Taxpayers reported said gain and paid tax thereon when return was filed for 1960. Said gain was thereby taxed 1½ times."

In his claim relating to the calendar year 1961, he stated he was entitled to an allowance of his claim for the following reason:

"Out of a deficiency assessed for calendar year 1961 in the amount of $10,999.84 including interest, $8,797.55 tax assessed of $10,295.12 total tax assessed was attributable to inclusion in income of $32,975 less $1,350.00 thereof alleged to constitute a distribution essentially equivalent to dividend which was in fact $33,000.00 proceeds for redeemed corporate stock of Southern Elevator & Storage Co., Inc. producing capital gain. Taxpayers reported said gain and paid tax thereon when return was filed for 1961. Tax paid on gain was allowed in calculating deficiency. * * * "

Treasury Regulations Section 301.6402-2 provides, in part, as follows:

"(b) Grounds set forth in claim.

" * * * The claim must set forth in detail each ground upon which a credit or refund is claimed and facts sufficient to apprise the Commissioner of the exact basis thereof. * * * "

The Government contends that the reference in the claims for refund as to whether the corporate distributions were "essentially equivalent to a dividend" did not set forth that the taxpayer was relying upon the ground that the corporate earnings and profits were insufficient for the payments of the amounts as dividends and that, therefore, he may not now rely upon that ground. There is obviously no reference in the claims to the matter of corporate earnings and profits being insufficient for the payments of the amounts involved as dividends. The taxpayer asserts that the Government was put on notice by the claims for refund as to the dividend issue and, of course, the Government was aware that one of the prerequisites of a dividend is sufficient corporate earnings and profits. It further appears that the Government was not caught off guard in the matter of litigating that issue. In the pretrial proceedings and in the presentation of evidence at the trial the Government demonstrated its knowledge that such issue was involved. The Court is of the view and holds that the taxpayer was entitled to raise such issue.

The next issue for consideration is whether the corporate earnings and profits and accumulated surplus were adequate to cover the redemption disbursements. This is the subject of vigorous controversy. Considerable evidence was presented on this issue and it was discussed at some length in the briefs. It involves a number of questions. The first question is the proper time to measure the adequacy of corporate earnings and profits. The parties are in agreement that the redemption occurred on January 15, 1959. The parties

are also in agreement that the cash disbursements by Southern to the taxpayer took place in 1960 and 1961 when the corporate non-interest bearing note given by Southern to the taxpayer was paid. Both parties seem to be in agreement that the 1960 and 1961 corporate distributions should be taxed to him in those years, i. e., the years of receipt, rather than in 1959 when he received the corporate note. The taxpayer reported the disbursements in his 1960 and 1961 income tax returns and he claimed a refund of the taxes involved for those same years. The taxpayer contends that although the tax impact of the redemption distributions should fall in the years of receipt, the proper point in time for the purpose of measuring the adequacy of corporate earnings and profits on the dividend issue shall have been on January 15, 1959, when the redemption occurred. The taxpayer cites in support of this last contention the case of Estate of James T. Moore, Tax Court Memo Decision 1961–257. That case does not support his contention. It had to do with when a redemption actually occurred and not when corporate earnings or profits are to be measured. In urging his position on this point the taxpayer seems to assume that the distribution occurred on January 15, 1959, when he was placed in possession of a non-negotiable, non-interest paying note not due for three years. It appears to be well settled that the date of the payment of a note rather than the date of delivery of the note is the dividend date. Emil Stein (1942), 46 B.T.A. 135; Estate of Joseph Nitto (1949), 13 T.C. 858, 867. The Court is of the view and holds that the time payments were made on the note is the proper time for measuring corporate earnings and profits for dividend purposes.

As noted above, the taxpayer has also questioned whether the earnings and profits of the corporation were adequate for dividend purposes. Section 316, heretofore referred to, provides, in part, as follows:

"§ 316. Dividend defined

"(a) General rule.—For purposes of this subtitle, the term 'dividend' means any distribution of property made by a corporation to its shareholders—

(1) out of its earnings and profits accumulated after February 28, 1913, or

(2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made.

Except as otherwise provided in this subtitle, every distribution is made out of earnings and profits to the extent thereof, and from the most recently accumulated earnings and profits. * * * "

■ It is well settled that earnings and profits is a statutory concept which is not identical with either earnings (or earned surplus) as determined by corporate accounting practice, or taxable income as computed under the Internal Revenue Code.

■ The non-interest bearing notes of Southern referred to above were paid to the extent of $13,558.75 each in the corporation's fiscal year ending March 31, 1961, and $22,141.25 each in the fiscal year ending March 31, 1962. It is the sufficiency of earnings and profits at the close of those respective years which is of importance, since under Section 316 distributions are deemed to be made, first, out of current year earnings and profits, to the extent thereof, and, if they be insufficient, the distribution is deemed to be made from earnings and profits accumulated since February 28, 1913, to the extent of the insufficiency. There is involved, first, current earnings and profits for the fiscal years of the corporation ending March 31, 1961, and March 31, 1962, and, second, the amount of earnings and profits accumulated subsequent to February 28, 1913, and avail-

able on the dates upon which the distributions were made.

The parties are in agreement that the books and records of the corporation as of the end of its March 31, 1960, fiscal year show an accumulated earned surplus of $4,728.87 which, of course, would be considered as available for dividend purposes. For the fiscal year ending March 31, 1961, the earnings before taxes were $41,466.88 and the tax liability was $16,062.78, leaving earnings and profits for that year of $25,404.10. For the fiscal year ending March 31, 1962, the earnings before taxes were $39,742.20 and the tax liability was $15,165.94, leaving earnings and profits for that year of $24,576.26.

The distributions to the taxpayer and Bryan for which earnings and profits must be shown available total $28,216.38 for the fiscal year ending March 31, 1961, and $44,557 for the fiscal year ending March 31, 1962. These figures reflect the totals for those years of note payments to the parties, plus cash dividends. As a result of an Internal Revenue Service audit, the amount of $6,875.89 was added as a cumulative credit to surplus for the fiscal years 1956 through 1959. As a result of a second audit by Internal Revenue Service, the amount of $2,985.91 was added as a further credit to surplus for the fiscal year ending March 31, 1960.

Since the combined current earnings and profits of the corporation for its fiscal years ended March 31, 1961 ($25,404.10), and March 31, 1962 ($24,576.26), plus accumulated corporate surplus for those years in the respective amounts of $14,590.67 and $11,788.39, are somewhat less than the amount of corporate distributions in those years by way of cash dividends to stockholders and the note payments to the taxpayer and Bryan, as set out above, there would be at least a partial inadequacy for dividend purposes to the taxpayer in the absence of any further factors to be considered. However, there is one such additional factor which the Government has referred to as an "excess depreciation item"

in the amount of $50,000. The parties are in controversy as to whether it should be considered in measuring the adequacy of earnings and profits for dividend purposes under the facts of this case.

The background of this so-called excess depreciation item is tied in with the incorporation of Southern. It was heretofore noted that following the formation of Southern its incorporators transferred to it for stock property acquired by them for $15,000. It appears this was a nontaxable incorporation under the provisions of Section 351, Title 26 U.S.C.A. The $15,000 cost basis of assets transferred to the corporation thus carried over and became the cost basis of such assets to the corporation. This is true even though the assets were set up on the corporate books and records at their then apparent fair market value of $65,000. Those assets were depreciated on a rapid write-off basis over a five-year period. Depreciation in the amount of $50,000 was taken as an expense on the corporate books as follows: fiscal year ending March 31, 1955 —$6,666.66; fiscal year ending March 31, 1956—$10,000; fiscal year ending March 31, 1957—$10,000; fiscal year ending March 31, 1958—$10,000; fiscal year ending March 31, 1959—$10,000; fiscal year ending March 31, 1960—$3,333.34. Southern was permitted to deduct depreciation for income tax purposes only on its cost basis of $15,000. An adjustment was made in the tax returns for this unallowable depreciation. The result of this means of accounting was that at the end of each of the fiscal years above referred to the corporation's earned surplus as shown by its books was less by the amount of the unallowable depreciation than the accumulated earnings and profits for tax purposes. The Government contends that the sum of $50,000 should be added to accumulations and profits for the fiscal year ending March 31, 1960, in determining the adequacy of earnings and profits and surplus for dividend purposes. The Court is of the view and holds that it should be so in-

cluded. It is the further view and holding of the Court that profits and earnings of the corporation were therefore adequate to cover the distribution payments.

There is then left for consideration the very troublesome and difficult question as to whether the redemption distributions were essentially equivalent to a dividend within the purview of Section 302(b) (1). In the case of United States v. Fewell (5th Cir. 1958), 255 F.2d 496, 499, the Court indicated that problems involved in determining whether distributions were essentially equivalent to a dividend are "nightmarish" in character. The Tax Court has called the problem "exasperating". Thomas G. Lewis (1960), 35 T.C. 71, 76. Another court has called the problem "vexing". Bradbury v. Commissioner of Internal Revenue (1st Cir. 1962), 298 F.2d 111, 114. Another court has referred to the morass created by the decisions. Ballenger v. United States (4th Cir. 1962), 301 F.2d 192, 196. In the last case the court was of the view that there seemed to be two distinct lines of decisions. It stated (pp. 196–197):

"* * * When the cases are viewed solely from the shareholder's perspective, two lines of decisions appear. The first applies a strict 'net effect' test. * * * Under this approach, factors to be considered are whether the same shareholders would have received the identical payments had the redemption been a dividend, and whether the redemption altered the shareholders' control over the corporation and their respective rights to its future earnings. * * *

"The second line of cases is not the direct antithesis of the first. All these cases adopt the 'net effect' test, but add a further consideration— whether or not there are legitimate business purposes for the redemption. * * *"

In the first line of decisions, the Court placed the decisions of the Courts of Appeal for the Second and Third Circuits. In the second line of decisions, it placed the decisions by the Tax Court, and the Courts of Appeal for the District of Columbia, the First, Fifth, Eighth, Ninth and Tenth Circuits. The Fifth Circuit Court of Appeals decision cited as supporting the second line of cases is the case of United States v. Fewell, supra. In that case the taxpayer sought to recover on the theory that a corporate distribution to him was not essentially equivalent to a dividend. The case was tried to a jury. The Court stated (255 F.2d p. 499):

"The gist of the court's charge is that if the transaction was for the purpose of improving the credit position of the corporation it was for a bona fide corporate purpose and was not essentially equivalent to the distribution of a taxable dividend within the meaning of the Internal Revenue Code. Thus the single test of corporate purpose was submitted to the jury. The Government contends that the charge is erroneous. * * *"

The Court then cites a case in which the net effect doctrine is stated and applied. The Court then continues (p. 499):

"In this Circuit it has been said that,

"'The so-called net-effect test is not a weighted formula by which to solve the issue before the court. The net effect of the transaction is not evidence or testimony to be considered; it is an inference to be drawn or a conclusion to be reached. * * * "Net effect" is a paraphrase for "essentially equivalent."' Commissioner of Internal Revenue v. Sullivan, 5 Cir., 1954, 210 F.2d 607, 609."

The Court goes on to state (pp. 500–501, footnote numbers and citations omitted):

"* * * Although we are not in accord with the Northrup rule [Northrup v. United States, 2 Cir., 1957, 240 F.2d 304] that a corporate purpose has no relevance, we are convinced that the mere existence of a single bona fide corporate purpose will not, standing alone, conclusively determine

that the transaction does not result in an essential equivalent of the distribution of a taxable dividend. * * * Hence the district court's instructions were erroneous * * *.

"Although no specific tests have been or can be stated, the decisions recognize certain criteria. Included are the following: The presence or absence of a bona fide corporate business purpose, whether the initiative for the distribution came from the corporation or from the participating stockholders, whether earnings and profits were available for dividends and the prior dividend history of the company, whether the transaction resulted in any substantial change in the ownership or control of the corporation, whether the transaction was the result of or resulted in a contraction of the corporation's business or narrowed its activities, whether the distribution was substantially pro rata among the stockholders, and whether the stock acquired by the corporation was cancelled and retired or held as treasury stock. * * * Other factors may be pertinent. Not all factors will be present in every case. Perhaps it would be an unusual case where all factors were present. In some situations some of the factors will weigh more heavily than in others."

In the same case the Court stated (255 F.2d p. 499):

"* * * The question whether or not a particular corporate transaction is essentially equivalent to the distribution of a taxable dividend is primarily a question of fact. * * *"

Apparently the only case subsequent to the case of United States v. Fewell, supra, in which the Fifth Circuit Court of Appeals dealt with the matter of a distribution being essentially equivalent to a dividend is the case Cobb v. Callan Court Company (1960), 274 F.2d 532. In that case it affirmed a district court holding that the redemption of certain preferred stock did not constitute a distribution equivalent to a dividend. The Court quoted that portion of its opinion in the *Fewell* case setting out the criteria to be considered.

It was heretofore noted that among the conditions specified by Parrish in connection with his employment by Southern was that he was to be able to obtain ownership in the business. Parrish testified by deposition in this case. In that connection he testified, in part, on direct examination, as follows:

"Q  Did you buy your stock direct from other stockholders or did you buy your stock from the corporation itself?

"A  I bought my stock from other stockholders.

"Q  Well, is it true that the other stockholders sold their shares to the corporation first in order to make them available to be sold to you?

"A  Right. Fact of the matter, I bought ten per cent from each of two stockholders, but it first went through the corporation, to me.

"Q  So you actually purchased from the corporation?

"A  Directly from the corporation, right.

"Q  Do you know why this was handled in this manner?

"A  No, sir.

"Q  Let me help you some there. Was it ever explained to you that certain income tax benefits could be derived from a so-called restricted stock option?

"A  I knew that there was a tax reason, but that was as far as I know.

"Q  Now, was that tax reason explained that any gain you might have received, at the time stock was issued to you, by the difference between fair market value and your purchase price, would not be realized income at the time of issuance?

"A  That's what I was led to understand, yes.

"Q  And was it explained to you that we had to go through the corporation in order for you to obtain such a tax advantage?

"A  Right.

"Q  Was this the only reason that the stockholders went through the corporation to get shares to you, in order to accomodate [sic] you income taxwise?

"A  I am sure it was."

It is apparent that the taxpayer who was making the arrangements for carrying out the stock transaction was familiar with the very fine tax advantages available to Parrish and Harris under the provisions of Section 421, Title 26 U.S.C.A., by virtue of their restricted stock option agreements.

There was considerable discussion in the briefs as to why the stock going to Parrish and Harris was routed through the corporation. The taxpayer and Bryan could have had the stock go directly from them to Parrish. It is true the stock was at that time under pledge to the Corpus Christi State National Bank, but it could not be routed through the corporation until it was released by the bank. As noted from the testimony of Parrish, the only reason he knew of for so doing was the expected tax saving to him. The taxpayer contends, and correctly so, that he and Bryan could have sold the specified number of shares of stock directly to Parrish and they would have had to pay only a capital gains tax on their gain or profit. The taxpayer by his subsequent actions manifested the view that he would be able to secure capital gains treatment for the amounts received by him even though the transaction was routed through the corporation. At the same time he and Bryan expected additional benefits from such transaction since they would, and did, receive 100 percent of the agreed upon value for their stock, while Parrish and Harris only paid 85 percent of such value.

It seems clear from the testimony of Parrish that the routing of the stock through the corporation was not a condition prescribed by him. He was concerned about ownership. As testified by Parrish, the only reason he knew for routing the stock through the corporation was to afford him a tax advantage.

The end result of routing the stock through the corporation under the agreement worked out by the taxpayer was to secure economic advantages for the taxpayer and Bryan at no additional cost to Parrish and Harris, and at the same time to provide the latter with very fine tax advantages, all at no apparent tax disadvantages to the taxpayer and Bryan, assuming the redemption held up as a capital gains transaction. Parrish and Harris were to buy their stock at 85 percent of the agreed upon value while the taxpayer and Bryan received 100 percent of such value. Parrish and Harris had the advantage of restricted stock options and the taxpayer and Bryan expected capital gains treatment on their stock redemptions.

It is the view and holding of the Court that the routing of the stock through the corporation for redemption by it did not serve any bona fide corporate purpose.

It seems clear that the initiative for the distribution by way of redemption came from the taxpayer rather than the corporation. The matters of corporate purpose and corporate initiative were two of the criteria referred to by the Fifth Circuit Court of Appeals in the case of United States v. Fewell, supra. Certain other criteria were also referred to by the Court in that case. One of those criteria was whether there were earnings and profits available for the redemption distributions. This Court has heretofore found and held that earnings and profits were available for that purpose in this case. Another criterion referred to by the Court was whether the transaction resulted in any substantial change in the ownership and control of the corporation. Prior to the redemption in this case, the taxpayer was a minority stockholder and could only exercise control by aligning himself with

one or more of the other stockholders. After the redemption, he was still a minority stockholder who could only exercise control by aligning himself with other stockholders.

Another criterion referred to by the Court was the matter of whether the transaction was the result or resulted in a contraction of the corporation's business or narrowed its activities. In the present case, at and around the time of the redemption, the corporation greatly expanded its activities. Another criterion referred to by the Court was whether the distribution was substantially pro rata among the stockholders. In the present case it was not.

In connection with the criterion just noted, the Court cites and refers to the case of Commissioner of Internal Revenue v. Snite (7th Cir. 1949), 177 F.2d 819. That case had to do with the statutory predecessor of Section 302(b) (1). In that case the Court stated (p. 823):

" * * * Redemption in this section, we believe, connotes something other than repurchase; it includes the idea of a surrender of shares by a stockholder and a retirement of that which he surrenders. * * * These taxpayers did not surrender their stock but sold it. They did not contemplate retirement of their shares and the corporation did not retire them. Rather it placed them in its treasury, as live assets to be disposed of as it should thereafter determine. * * * "

It appears that, with one exception, all the criteria referred to by the Court of Appeals for the Fifth Circuit in the case of United States v. Fewell, supra, when applied to the situation in the present case, sustain the position of the Government herein that the distributions in question were essentially equivalent to a dividend.

■ The one exception is the criterion of whether distributions were made pro rata among the stockholders. As heretofore noted, they were not so made in this case. In that connection,

the Fifth Circuit Court of Appeals cited, among others, the cases of Kessner v. Commissioner of Internal Revenue (3d Cir. 1957), 248 F.2d 943, and Commissioner of Internal Revenue v. Sullivan (5th Cir. 1954), 210 F.2d 607. In both of the cited cases, a pro rata distribution had been made. In each case it was held that such feature was not determinative of the question as to whether the distributions involved were or were not essentially equivalent to a dividend. The converse would obviously be true, i. e., the fact that the distribution was not pro rata would not be determinative of the question as to whether a distribution was or was not essentially equivalent to a dividend. The matter of pro rata or non pro rata distributions would seem to be only one of a number of factors to be considered.

■ Upon consideration of all the criteria and factors, it is the view and holding of the Court that the evidence preponderates that the distributions in question were essentially equivalent to a dividend.

The foregoing constitutes the Findings of Fact herein.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the subject matter of this action and the parties thereto.

2. The plaintiffs William H. Bloch and Audrey H. Bloch are entitled to recover the deficiency taxes collected from them based on the installment sale transaction, together with interest thereon as provided by law.

3. The plaintiffs William H. Bloch and Audrey H. Bloch are not entitled to recover the deficiency taxes collected from them in connection with the distributions made to them by the Southern Elevator and Storage Company, Inc.

## ORDER FOR JUDGMENT

It is hereby ordered that judgment shall be entered in accord with the foregoing.